AO 91 (Rev. 11/11) Criminal Complaint                           AUSA Richard M. Rothblatt (312) 353-4558

**FILED**
3/16/2023
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA

v.                                                  CASE NUMBER: 1:23-cr-00151

JELILA ADEKUNLE,
    also known as "Linda Williams"

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about May 26, 2022 and on or about September 19, 2022, at Chicago, in the Northern District of Illinois, Eastern Division, the defendant violated:

**Count One – Knowing Participation in Financial Transaction to Conceal Funds Represented to be Derived from Specified Unlawful Activity**

| Code Section | Offense Description |
|---|---|
| Title 18, United States Code, Section 1956(a)(3)(B) | did knowingly participate in a financial transaction for the purpose of concealing the nature, source, ownership, location, and origin of funds represented to be derived from specified unlawful activity |

**Count Two – Concealment Money Laundering**

| Code Section | Offense Description |
|---|---|
| Title 18, United States Code, Section 1956(a)(1)(B)(i) | did knowingly conduct and attempt to conduct a financial transaction affecting interstate and foreign commerce, namely, a wire transfer in the amount of $197,000 sent to a bank/company located in Nigeria, which involved the proceeds of a specified unlawful activity, namely, wire fraud |

This criminal complaint is based upon these facts:

 X  Continued on the attached sheet.

_____
MARK Z. JOHN
Special Agent, Federal Bureau of Investigation
(FBI)

Pursuant to Fed. R. Crim. P. 4.1, this Complaint is presented by reliable electronic means. The above-named agent provided a sworn statement attesting to the truth of the Complaint and Affidavit by telephone.

Date: <u>March 16, 2023</u>

*Judge's signature*

City and state: <u>Chicago, Illinois</u>          <u>JEFFREY T. GILBERT, U.S. Magistrate Judge</u>

*Printed name and title*

UNITED STATES DISTRICT COURT

ss

NORTHERN DISTRICT OF ILLINOIS

## **AFFIDAVIT**

I, MARK Z. JOHN, being duly sworn, state as follows:

1.      I am a Special Agent with the Federal Bureau of Investigation (FBI) and have been so employed since February 2009.  My current responsibilities include the investigation of white-collar crime, including mail, wire, and bank fraud and money laundering offenses.

2.      This affidavit is submitted in support of a criminal complaint alleging that JELILA ADEKUNLE, also known as "Linda Williams," has violated Title 18, United States Code, Sections 1956(a)(1)(B)(i) and (a)(3).  Because this affidavit is being submitted for the limited purpose of establishing probable cause in support of a criminal complaint charging ADEKUNLE with money laundering of funds represented to be derived from specified unlawful activity and laundering funds derived from wire fraud, I have not included each and every fact known to me concerning this investigation.  I have set forth only the facts that I believe are necessary to establish probable cause to believe that the defendant committed the offense alleged in the complaint.

3.      This affidavit is based on my review of recorded conversations and associated draft transcripts, bank records, my personal knowledge, and information provided to me by witnesses and other law enforcement officials, my experience and training, and the experience and training of other law enforcement officials.

1

## FACTS SUPPORTING PROBABLE CAUSE

### Summary

4.     The FBI is investigating Chicago-based individuals engaged in money laundering of fraud proceeds. As discussed below, in March 2022, a confidential source ("CS-1")[1] informed law enforcement officials that, based on direct conversations and information from others, JELILA ADEKUNLE,[2] also known as "Linda Williams," was involved in laundering money through currency exchanges and bank accounts, in names of fictitious individuals and businesses, which she opened and controlled using false identification, including passports.    CS-1 said that

---

[1] CS-1 began cooperating with law enforcement officials in or around December 2021.  In 2019, CS-1 was charged in United States District Court, Northern District of Illinois, with money laundering conspiracy and substantive concealment money laundering, in violation of Title 18, United States Code Section 1956.  CS-1 is cooperating in the hopes of receiving sentencing consideration in his pending case.  As discussed below, information provided by CS-1 has been corroborated by, among other things, recorded interactions with ADEKUNLE, surveillance, and bank records.  Accordingly, I believe that the information provided by CS-1 is reliable.

[2] Law enforcement officials identified ADEKUNLE as follows: on or about April 20, 2022, law enforcement officials showed CS-1 an Illinois driver's license photograph of "Jelila Adekunle" with no named identified on the photograph.  CS-1 positively identified the person depicted in the photograph as "Jelila Adekunle."   Furthermore, CS-1 informed law enforcement officials that ADEKUNLE used phone number (XXX) XXX-0283 ("ADEKUNLE Phone 1") and resided at a residence on South Shore Drive in Chicago, Illinois ("ADEKUNLE Residence"). According to public databases, which sourced bank account header records and vehicle registration information, ADEKUNLE was associated with ADEKUNLE Phone 1 and ADEKUNLE Residence.  According to subpoenaed records, ADEKUNLE Phones 1 and 2 are prepaid devices with no associated subscriber name or address. In addition, law enforcement officials reviewed bank surveillance footage and conducted surveillance of meetings between CS-1 and ADEKUNLE in April and May 2022, as discussed below, and observed the person with whom CS-1 met.   Based on a review of surveillance footage and surveillance observations and a review of the Illinois license photograph for "Jelila Adekunle," law enforcement officials identified ADEKUNLE.

ADEKUNLE had independently reached out to him to express her interest in moving money through currency exchanges and bank accounts for a fee.

5.     Further, following numerous WhatsApp calls, messages, and voice note exchanges between CS-1 and ADEKUNLE during the period from March to May 2022, law enforcement officials caused funds represented to be fraud proceeds to be wired to a bank account maintained by ADEKUNLE in a fictitious name (Linda Williams).  After ADEKUNLE received approximately $80,000 in wire transfers into her bank account, ADEKUNLE withdrew funds in cash through multiple transactions, met with CS-1, and provided CS-1 with the purported fraud proceeds less a 20 percent commission, which she kept.

6.     Moreover, the investigation has revealed ADEKUNLE has used the same bank accounts opened in the names of fictitious individuals and businesses to receive and launder fraud proceeds from other unidentified subjects and/or co-conspirators.  In September 2022, one of these bank accounts was used to receive an approximately $600,000 wire transfer from a victim of a business email compromise scheme in Overland Park, Kansas.  ADEKUNLE then attempted to quickly disburse the funds from the account including through sending a large wire transfer to a beneficiary located in Nigeria.

### ADEKUNLE Launders $80,000 Represented as PPP Fraud Proceeds

*Scheme and Subject Accounts*

7.     In March 2022, CS-1 provided law enforcement officials with information regarding an individual named "JELILA ADEKUNLE," whom CS-1

knew to be involved in laundering money through currency exchanges and bank accounts. According to CS-1:

      a.    CS-1 and ADEKUNLE met on Snapchat, an online messaging and social networking application. Shortly afterwards, during an in-person meeting, ADEKUNLE initiated discussions with CS-1 about her involvement in money laundering.

      b.    Beginning in or around March 2022, ADEKUNLE communicated with CS-1, primarily over WhatsApp, about her interest in and ability to receive funds in four bank accounts, which she had opened in fictitious names using false identification, including passports.[3] These conversations were not recorded.[4]

      c.    ADEKUNLE said that she provided these services – i.e., receiving funds in her bank accounts from multiple clients in exchange for commissions and that her clients had lowered the commissions that they paid her. Accordingly, ADEKUNLE was looking for new clients.

    8.    According to CS-1, in March 2022, ADEKUNLE informed CS-1 that she uses phone number (XXX) XXX-0283 ("ADEKUNLE Phone 1"). On or around the same date, at the direction of law enforcement, ADEKUNLE began communicating with CS-1, using a WhatsApp business account with the username "JJ Empress-ROYAL'S EMPORIUM" ("ADEKUNLE Account 1"). An image of the ADEKUNLE

---

[3] According to CS-1, in a later unrecorded communication, ADEKUNLE informed CS-1 that the foreign passports were made in Africa and shipped to the United States.

[4] As discussed below, law enforcement officials confirmed communications between CS-1 and ADEKUNLE, using WhatsApp Accounts (ADEKUNLE Accounts 1 and 2), based on a review of screenshots of CS-1's contact log on WhatsApp.

Account 1 profile provided by CS-1 to law enforcement officials included the address "4554 North Broadway, Suite 327, Chicago, Illinois 60640" and a description, which stated, "We sells [sic] trendy outfits for both female and male, Abaya, jalabi, and varieties of Turkish wears." Review of subpoenaed records from WhatsApp confirmed that ADEKUNLE Account 1 is registered to the above-listed business name and address, has an account identifier of ADEKUNLE Phone 1, and a push name of "Royal's Emporium."[5]

9.      Based on the information provided by CS-1, law enforcement officials directed CS-1 to make contact with ADEKUNLE to discuss her ability to move funds received from third parties.

10.      Between on or about March 8, 2022, at approximately 1:39 p.m., and March 9, 2022, at approximately 1:15 p.m., CS-1 and ADEKUNLE, using ADEKUNLE Account 1, began exchanging messages on WhatsApp.[6]  During the exchange[7]:

---

[5] Based on my training and experience and familiarity with the WhatsApp service, I understand that a "push name" is the name a user puts into his or her account, which is viewable to other users when communicating.

[6] Law enforcement officials are in possession of all of the WhatsApp messages exchanged between ADEKUNLE, using ADEKUNLE Accounts 1 and 2, and CS-1 referenced in this affidavit. These messages were obtained from CS-1.

[7] Some of the WhatsApp messages, voice notes, and calls, and meetings between ADEKUNLE and CS-1 have been summarized in this Affidavit. The language that is quoted from those materials throughout this Affidavit is based upon a preliminary review of those materials. The times listed for the communications and meetings are approximate. The summaries do not include all statements or topics covered during the course of the communications and meetings. The recorded communications and meetings occurred in a mix of English and Yoruba and FBI linguists have provided me with draft translations of those exchanges. At various points in the Affidavit, I have included in brackets my interpretation of words and phrases used in the materials. My interpretations are based on the contents and context of

a.      At approximately 1:39 p.m., ADEKUNLE stated, "Good afternoon sir," and "It Jelilat sir."

b.      On the following date, at approximately 12:52 p.m., CS-1 replied, "Hellos" and ADEKUNLE stated, "Good afternoon sir."

c.      A few minutes later, at approximately 12:56 p.m., CS-1 stated: "I want to talk to Jubi [third party engaged in fraud and money laundering]" and "Can you send me the bank names and account information then I set you guys to meet." ADEKUNLE responded, "Ok sir."

d.      At approximately 1:08 p.m. and 1:15 p.m., ADEKUNLE wrote: "BANK NAME: US BANK BUSINESS NAME D3 PROCESS LLC ACCOUNT NUMBER: XXXXXXXX2182 ROUTE NUM: XXXXXX779," ("Subject Account 1") and "BANK NAME: CHASE BANK NAME LINDA WILLIAMS CHECK ACCOUNT NUMBER: XXXXXX953" ("Subject Account 2").

11.     Law enforcement officials obtained records from US Bank and Chase Bank for Subject Accounts 1 and 2, respectively.

12.     According to the records provided by US Bank, Subject Account 1 is in the name of "Linda Williams/D3 Process, LLC" and was opened with a $100 deposit on December 27, 2021, by a sole signatory, "Linda Williams," address XXXX 168th Street, Country Club Hills, Illinois 60478-2127 (the "168th Street Address"), and

---

the materials, events occurring before and after the communications and meetings, information provided by CS-1, my knowledge of the investigation as a whole, my experience and training, and the experience and training of other law enforcement officials in this investigation.

phone number (XXX) XXX-4714 ("ADEKUNLE Phone 2"),[8] using a Kenyan passport in the name of "Linda Williams" for identification.

13.     According to Illinois Secretary of State records, D3 Process, LLC (the company associated with Subject Account 1) has an active status and was incorporated on December 16, 2021, using the Agent/Manager name of "Linda Williams" and the 168th Street Address as a principal office.

14.     Law enforcement officials obtained surveillance video from US Bank. Based on a review of that surveillance footage from a US Bank branch in Lemont, Illinois for December 27, 2021, ADEKUNLE opened Subject Account 1.

15.     According to records provided by Chase Bank, Subject Account 2 is in the name of "Linda Williams" and was opened with a $50 deposit on or about February 5, 2022, by a sole signatory, "Linda Williams," listing the address XXXX E. 71st Place, Chicago, Illinois (the "71st Place Address") and ADEKUNLE Phone 2. Furthermore, Chase Bank records show the account owner used a Kenyan passport, depicting an image of ADEKUNLE but in the name of "Linda Williams" and a utility bill for identification.

16.     A search of Department of Homeland Security databases revealed no record of a person ever entering or exiting the United States using the passport ADEKUNLE used to open Subject Accounts 1 and 2.

---

[8] According to subpoenaed records, ADEKUNLE Phone 2 is a prepaid device with no associated subscriber name or address.

17.     Based on my training and experience and knowledge of the investigation, I believe that ADEKUNLE obtained and used the fraudulent "Linda Williams" passport to conceal her connection to the Subject Accounts because she intended to use the Subject Accounts in furtherance of money laundering activities.

*On or about April 27, 2022, ADEKUNLE Received Approximately $50,000 in Funds Represented to be Proceeds of PPP Fraud and Later Transferred Approximately $40,000 in Cash to CS-1 During Two Meetings*

18.     Based on the information provided by ADEKUNLE to CS-1 regarding her use of multiple bank accounts and law enforcement's identification of those accounts, law enforcement officials directed CS-1 to make contact with ADEKUNLE and advise ADEKUNLE that he had approximately $50,000 in fraud proceeds that he needed to launder and to ask for ADEKUNLE's assistance in laundering those proceeds.

19.     On or about April 5, 2022, between approximately 11:08 a.m. and 11:12 a.m., and on or about April 7, 2022, between approximately 3:14 p.m. and 3:34 p.m., ADEKUNLE, using ADEKUNLE Account 1, and CS-1 exchanged calls and messages on WhatsApp. During the exchange on or about April 5, 2022, at approximately 11:12 a.m. and 12:02 p.m., ADEKUNLE sent a message asking, "When should I bring my car [to receive money] sir[?]" and placed an unanswered call to CS-1.

20.     On or about April 7, 2022, at approximately 3:14 p.m., CS-1 replied, "The check [fraud proceeds] will be ready [available to transfer] next week for sure." ADEKUNLE immediately responded, "OLUWASEUN [Yoruba term meaning thanks to God]," and "I just got home thank you so much daddy." At approximately 3:33 p.m.

8

and 3:34 p.m., ADEKUNLE added, "Gloria Toku [identity used to cash checks at currency exchange]," and "LINDA WILLIAMS [identity used to open Subject Accounts 1 and 2]."

21. Based on my training and experience and knowledge of the investigation, I believe that in the above exchange: (a) ADEKUNLE asked when CS-1 would send her the fraud proceeds, which she would move through Subject Accounts 1 and/or 2; (b) CS-1 told ADEKUNLE the fraud proceeds would be available for transfer to Subject Accounts 1 and/or 2 in approximately one week; and (c) ADEKUNLE affirmed and provided CS-1 with the names (Gloria Toku and Linda Williams) that she uses to process funds for the purpose of money laundering.

22. On or about April 14, 2022, at approximately 2:14 p.m., CS-1 called ADEKUNLE Account 1 and spoke to ADEKUNLE on WhatsApp. The conversation was not recorded but occurred on speaker phone in Yoruba in the presence of law enforcement officials.[9] According to CS-1, during the discussion:

    a. CS-1 said the money he planned to transfer to ADEKUNLE was proceeds of an "ise or odu [Yoruba terms meaning job commonly used as slang for fraud]."

    b. ADEKUNLE told CS-1 that she would charge 25 percent to receive the funds in her bank accounts and provide CS-1 with cash. CS-1 stated his people [purported criminal associates] would only pay 20 percent.

---

[9] The phone conversation between ADEKUNLE and CS-1 was not recorded due to an equipment malfunction.

      c.      CS-1 then asked the amount of commission paid by ADEKUNLE to cash checks at the currency exchange. ADKUNLE replied she knows people there and usually pays them with a tip.

      d.      CS-1 said that his associate wanted to send ADEKUNLE $50,000 and ADEKUNLE stated that would not be a problem and agreed to send CS-1 details for a bank account in a business name at US Bank for the transfer.

23.     On or about April 14, 2022, between approximately 9:07 p.m. and 9:09 p.m., ADEKUNLE, using ADEKUNLE Account 1, sent CS-1 messages over WhatsApp, which contained images of bank mobile applications, or websites showing available balances and other details for Subject Accounts 1 and 2 including partial account numbers and the greeting "Welcome Linda." CS-1 replied, "Ok."

24.     On or about April 16, 2022, between approximately 1:11 p.m. and 1:57 p.m., ADEKUNLE, using ADEKUNLE Account 1, and CS-1 exchanged additional messages over WhatsApp. During the exchange, at approximately 1:57 p.m., ADEKUNLE asked, "Any update sir[?]" and CS-1 responded, "Will let u know by Tuesday for sure." ADEKUNLE then stated, "OK sir."

25.     On or about April 20, 2022, at approximately 1:07 p.m., CS-1 called ADEKUNLE Account 1 and spoke to ADEKUNLE on WhatsApp. The call was recorded. During the call:

a.      CS-1 stated that the money that was to be sent to ADEKUNLE's bank accounts was from a PPP "fraud"[10] and was already in his associate's bank account.

b.      CS-1 asked if his associate could transfer $50,000 to ADEKUNLE's bank account and if she would accept a commission of 17 percent.

c.      ADEKUNLE replied she was unsure about the commission and suggested using her personal bank account at Chase Bank (Subject Account 2) because Chase Bank asked fewer questions and their procedures were less cumbersome.

d.      CS-1 said that his associate had previously transferred $200,000 of $400,000 from his account, but that the money had not been returned.  CS-1 asked how long it would take for ADEKUNLE to get all the money out of her bank accounts.

---

[10] Based on my training and experience, and the training and experience of other agents, I know that the Coronavirus Aid, Relief, and Economic Security ("CARES") Act was a federal law enacted in or around March 2020 and designed to provide emergency financial assistance to the millions of Americans who were suffering the economic effects caused by the COVID-19 pandemic. One source of relief provided by the CARES Act was the authorization of forgivable loans to small businesses for job retention and certain other expenses, through a program called the Paycheck Protection Program ("PPP"). The PPP loan application required applicants to acknowledge the program rules and make certain affirmative certifications regarding the eligibility of the business.  The PPP allowed the interest and principal on the PPP loan to be entirely forgiven by the U.S. Small Business Administration if the applicant spent the loan proceeds on these items within a designated period of time and used at least a certain percentage of the PPP loan for payroll expenses. Applicants who obtained PPP loan proceeds by lying about the existence of a fictious business, or by providing false information about a business's payroll, income, operating expenses, or how the PPP loan would be used, were engaged in "PPP fraud."

e.     ADEKUNLE responded it would take five days to withdraw the funds from her personal account if they used that account rather than the business account.

f.     CS-1 explained that his associate was not in a rush to collect the money because the "fraud" is "sealed" [complete and undetectable] and the funds were safe in his account.

g.     CS-1 asked ADEKUNLE about the largest amount that she could negotiate at the currency exchange. ADEKUNLE said that CS-1's associate could write her a check for $50,000 and that she typically uses a currency exchange in Dolton [Illinois].

h.     CS-1 asked about fees for the service and ADEKUNLE responded she has established a good relationship there and knows when and how to pay them if asked.

i.     ADEKUNLE said that CS-1's associate could send a $100,000 wire transfer to her personal bank account. ADEKUNLE explained that she could withdraw $9,000 at the bank and $3,000 at ATMs, or $12,000 per day from her personal bank account at Chase Bank allowing her to obtain the full $50,000 received from CS-1's associate within five days.

j.     ADEKUNLE agreed to send the bank account information to CS-1.

26.     Based on my training and experience and knowledge of the investigation, I believe that in the above exchange: (a) CS-1 stated his associate

intended to transfer $50,000 of $400,000 in purported PPP fraud proceeds previously deposited into his bank account to Subject Accounts 1 and/or 2 for a negotiated commission; (b) ADEKUNLE stated that she preferred to use her personal rather than business account (Subject Account 2) due to differences in bank policies making it less likely her money laundering activity would be detected; (c) CS-1 said his associate previously used a different method and person to launder $200,000 in fraud proceeds; (d) CS-1 stated his associate was confident the fraud would not be discovered; (e) ADEKUNLE explained she could launder funds at an unidentified currency exchange in Dolton, Illinois through cashing checks for an unspecified fee; and (f) ADEKUNLE stated she planned to withdraw $50,000 transferred to Subject Account 2 in structured amounts over a five-day period through $9,000 counter and $3,000 ATM transactions, in an attempt to circumvent Bank Secrecy Act (BSA) reporting thresholds.

27.     Shortly after the call, on or about April 20, 2022, at approximately 1:22 p.m., ADEKUNLE, using ADEKUNLE Account 1, sent a WhatsApp message to CS-1, which included the bank name and account and routing numbers for Subject Account 2.

28.     On or about April 25, 2022, between 11:57 a.m. and 12:44 p.m., ADEKUNLE, using ADEKUNLE Account 1, and CS-1 communicated over WhatsApp. During the exchange:

        a.     At approximately 11:59 a.m., CS-1 stated, "He [CS-1's associate] will be sending 2 payments. Says he has a limit of $30000 a day so he will send one

13

tomorrow and the other on Thursday," and "He is asking which account you want it to go and if the account is still good to go."

      b.    At approximately 12:00 p.m., ADEKUNLE sent an image showing details for Subject Account 2 with the caption, "This," and a voice note in Yoruba, during which she stated the Chase account [Subject Account 2] is good [available to receive money from CS-1's associate] for any amount, she can equally withdraw [launder funds] at the currency exchange if CS-1 wanted to send it [money from CS-1's associate] there, and that she would login to the Chase account [Subject Account 2] to confirm it is perfectly okay. CS-1 immediately replied, "Ok."

      29.    Based on my training and experience and knowledge of the investigation, I believe that in the above exchange: (a) CS-1 indicated that his associate planned to transfer $50,000 in purported fraud proceeds from his bank account to Subject Account 2 in two transactions; and (b) ADEKUNLE confirmed Subject Account 2 should still be used to launder the funds.

      30.    According to a review of WhatsApp records, on or about April 26, 2022, at approximately 2:37 p.m., ADEKUNLE, using ADEKUNLE Account 1, called CS-1 and CS-1 did not answer.

      31.    Beginning a few minutes later, between approximately 2:39 p.m. and 5:01 p.m., ADEKUNLE, using ADEKUNLE Account 1, and CS-1 exchanged messages on WhatsApp. During the exchange:

      a.    At approximately 2:39 p.m., CS-1 stated, "Was on phone with him [CS-1's associate] says he's doing it [transferring funds] this afternoon." ADEKUNLE

responded, "Ok sir." At approximately 4:49 p.m., CS-1 asked, "What's the address for the account." Approximately one minute later, ADEKUNLE replied by sending CS-1 a voice note, during which she said she would quickly go through [review Subject Account 2 information] and send it [address] now.

      b.    CS-1 immediately responded, "Send it [account address] I have people here." At approximately 4:59 p.m., ADEKUNLE replied, "[the full address for the 71st Place Address]." At approximately 5:01 p.m., CS-1 stated, "Ok."

32.    Based on my training and experience and knowledge of the investigation, I believe that in the above exchange, CS-1 informed ADEKUNLE that his associate was in the process of transferring fraud proceeds to Subject Account 2 and needed the street address listed on the account for wire instructions and ADEKUNLE provided the 71st Place Address.

33.    On or about April 27, 2022, law enforcement officials sent a $50,000 wire transfer from a covert FBI account to Subject Account 2 for beneficiary "Linda Williams," using the 71st Place Address, as designated by ADEKUNLE.

34.    On or about April 27, 2022, between approximately 12:12 p.m. and 8:07 p.m., ADEKUNLE, using ADEKUNLE Account 1, and CS-1 exchanged messages on WhatsApp about the status of the wire transfer. During the exchange:

      a.    At approximately 12:12 p.m., CS-1 stated, "Check and see if it's [the $50,000] in [Subject Account 2]." ADEKUNLE replied, "Ok sir." At approximately 12:21 p.m., ADEKUNLE sent an image of the Chase Bank mobile application showing the available balance in Subject Account 2 as $40.18. CS-1 then

15

stated, "Ok keep an eye [monitor account activity]," and ADEKUNLE replied, "Ok sir."

b.      Later in the day, at approximately 3:39 p.m., CS-1 stated, "Check again. It's 50k [$50,000]." At approximately 3:45 p.m., ADEKUNLE responded, "OK," and sent a voice note during which she stated she always leaves her phone in the house, but would turn back, look through it, and send a screenshot to CS-1. At approximately 3:57 p.m., ADEKUNLE sent another image of the Chase Bank mobile application showing the available balance in Subject Account 2 as $40.18.  At approximately 3:58 p.m., CS-1 stated, "Ok wait till morning." ADEKUNLE then placed an unanswered call to CS-1 over WhatsApp and responded, "Yeah," and "It may take 24 hours."  CS-1 then stated, "Ok."

c.      At approximately 8:01 p.m., ADEKUNLE sent another image of the Chase Bank mobile application showing the available balance in Subject Account 2 as $50,040.18 and a message, which stated, "I go start collect it [withdraw cash] tomorrow."  In reply, at approximately 8:04 p.m., CS-1 asked, "Nice. How long will it take u to get the funds[?]" A few minutes later, ADEKUNLE replied, "Four to five days."

35.    On or about April 29, 2022, between approximately 10:56 a.m. and 11:07 a.m., ADEKUNLE, using ADEKUNLE Account 1, and CS-1 exchanged messages on WhatsApp to coordinate an in-person meeting to exchange the funds transferred to Subject Account 2. During the exchange:

a.    At approximately 10:56 a.m., CS-1 stated, "How far[?] What time you going [to bank] today[?]" and "I want to give the guy [CS-1's associate] something [money] today." A few minutes later, ADEKUNLE responded, "OK sir," and "By 2 [p.m.]" CS-1 then stated, "Ok when you do let me know how much [total amount withdrawn] maybe u take [a commission of] 5k [$5,000] now and 5k [$5,000] after [the transaction is complete]," and "We can meet after 2 [p.m.]" ADEKUNLE responded, "Ok sir." At approximately 11:06 a.m., CS-1 stated, "Go to Popeye's [restaurant] when you get here I meet you there by 2 [p.m.]." ADEKUNLE then replied, "OK sir."

36.    Based on my training and experience and knowledge of the investigation, I believe that in the above exchange: (a) ADEKUNLE confirmed that $50,000 had been transferred to Subject Account 2; (b) ADEKUNLE and CS-1 arranged a meeting time and place to exchange cash withdrawn from Subject Account 2; and (c) ADEKUNLE agreed to accept a commission of $5,000 on the current date and another $5,000 after the full amount of the $50,000 transfer was withdrawn from Subject Account 2 and given to CS-1 in cash.

37.    On or about April 29, 2022, law enforcement officials met with CS-1 and affixed a concealed audio and video recording device to him. Law enforcement officials then setup surveillance in the area of a Popeye's restaurant located on the 7000 block of South Western Avenue in Chicago, Illinois.

38.    At approximately 3:02 p.m., ADEKUNLE, using ADEKUNLE Account 1, called CS-1 on WhatsApp.  The call was recorded over CS-1's audio and video recording equipment.  During the call:

      a.    ADEKUNLE and CS-1 coordinated their meeting.

      b.    ADEKUNLE also asked when CS-1's associate would deposit additional funds into Subject Account 2 and CS-1 said that ADEKUNLE would need to provide him with the funds already wired into her account before his associate wired ADEKUNLE additional funds.

      c.    ADEKUNLE said that it would take approximately three days to withdraw the funds from her account.  CS-1 said that he would verify the cash that ADEKUNLE brought to their meeting.

39.    Subpoenaed records and surveillance footage from Chase Bank show that prior to meeting CS-1, ADEKUNLE withdrew cash from Subject Account 2 through a number of transactions, as set forth below.  Based on my training and experience, the transactions were structured such that they involved less than $10,000 and occurred at multiple bank branches, in an attempt to circumvent BSA reporting requirements and avoid bank suspicion about ADEKUNLE's withdrawals.

| Date | Time | Branch | Type | Amount |
|---|---|---|---|---|
| 4/28/2022 | 2:05 PM | Uptown Chicago – 1101 W. Lawrence Avenue, Chicago, IL | Teller | $9,000 |
| 4/28/2022 | 2:37 PM | Howard & Clark - 1791 W. Howard Street, Chicago, IL | ATM | $2,000 |
| 4/29/2022 | 1:47 PM | Hyde Park - 1204 E. 53rd Street, Chicago, IL | Teller | $9,000 |
| 4/29/2022 | 2:14 PM | Stony Island - 6650 S. Stony Island Avenue, Chicago, IL | ATM | $3,000 |

40. At approximately 3:05 p.m., law enforcement officials conducting surveillance observed ADEKUNLE arrive in a black Cadillac sedan ("ADEKUNLE Vehicle 1")[11] and park on W. 73rd Street adjacent to Popeye's restaurant. CS-1 then exited his vehicle and entered the front passenger side door of ADEKUNLE Vehicle 1.

41. Based on a review of the audio and video recording, photographs of the transaction captured by law enforcement officials, and information provided by CS-1, during the meeting:

a. CS-1 began counting cash contained in two white envelopes given to him by ADEKUNLE after he entered ADEKUNLE Vehicle 1.

b. CS-1 asked if ADEKUNLE opened Subject Account 2 with an identification card or passport. ADEKUNLE replied that she used a passport.

c. CS-1 and ADEKUNLE discussed the amount of cash that ADEKUNLE withdrew from Subject Account 2 and brought to the meeting. ADEKUNLE said that she had withdrawn $23,000 from the account including through a $9,000 transaction at the bank and a $2,000 ATM transaction that day.

d. During the meeting, at approximately 3:14 p.m., ADEKUNLE, using ADEKUNLE Account 1, sent an image to CS-1 over WhatsApp of the Chase Bank mobile application showing the available balance of Subject Account 2 as $26,977.76.

---

[11] According to records from the Wisconsin Secretary of State database, ADEKUNLE Vehicle 1 is registered to Individual A at an address in Madison, Wisconsin.

e.     CS-1 then advised ADEKUNLE to wait until the following week to withdraw the remaining funds in Subject Account 2.  CS-1 said that he would give the cash to his associate, who would deposit another $40,000 into Subject Account 2 the following week.

42.     At approximately 3:15 p.m., law enforcement officials observed CS-1 exit ADEKUNLE Vehicle 1 and reenter his own vehicle.  CS-1 then immediately met with law enforcement officials at a predetermined nearby location. Review of the video recording confirmed CS-1 drove directly to and from the location he met with law enforcement officials and Popeye's restaurant before and after the transaction.

43.     At this location, CS-1 gave law enforcement officials two white envelopes containing large quantities of cash.  CS-1 told law enforcement officials that ADEKUNLE kept $5,000 in cash withdrawn from Subject Account 2, or a 20 percent commission. After CS-1 departed, law enforcement officials sealed, transported, and secured the envelopes in storage. The envelopes were later photographed by law enforcement officials and determined to contain $18,000 in cash by a bank employee.

44.     On or about May 4, 2022, between approximately 10:22 a.m. and 2:56 p.m., ADEKUNLE, using ADEKUNLE Account 1, and CS-1 exchanged messages on WhatsApp. During the discussion, CS-1 asked, "What time will u get the rest[?] The guy [CS-1's associate] just call me." ADEKUNLE replied, "By 3pm sir." CS-1 stated, "By 3 [p.m.]. So the balance of $22k [$22,000]. So we can move forward [launder additional funds]." ADEKUNLE responded, "Yes sir." CS-1 then stated, "Ok," and

"Try to be on time I have to see him [CS-1's associate] by 3.15 [p.m.]" ADEKUNLE replied, "No problem."

45.     Later that afternoon, at approximately 2:54 p.m. CS-1 asked, "How far are you[?]" and ADEKUNLE responded, "10 minutes away." CS-1 then stated, "Ok no problem," and "Let's meet at the same place like the last time." ADEKUNLE replied, "OK sir."

46.     Based on my training and experience and knowledge of the investigation, I believe that in the above exchange: (a) ADEKUNLE informed CS-1 that she would withdraw the remaining $22,000 from Subject Account 2 and be available to exchange the cash so that CS-1 could then give it to his associate; (b) after completion of the transaction, CS-1's associate would proceed with laundering additional funds; and (c) CS-1 directed ADEKUNLE to meet him to exchange the cash at the same location near Popeye's restaurant where they previously met.

47.     Subpoenaed records and surveillance footage from Chase Bank show that prior to meeting CS-1, ADEKUNLE withdrew cash from Subject Account 2 through a number of transactions, as set forth below.  Based on my training and experience, the transactions were structured such that they involved less than $10,000 and occurred at multiple bank branches, in an attempt to circumvent BSA reporting requirements and avoid bank suspicion about ADEKUNLE's withdrawals.

| Date | Time | Branch | Type | Amount |
|---|---|---|---|---|
| 4/30/2022 | 1:11 PM | Hyde Park - 1204 E. 53rd Street, Chicago, IL | ATM | $3,000 |
| 5/2/2022 | 3:03 PM | Hyde Park - 1204 E. 53rd Street, Chicago, IL | Teller | $9,000 |
| 5/2/2022 | 3:42 PM | Stony Island - 6650 S. Stony Island Avenue, Chicago, IL | ATM | $3,000 |
| 5/4/2022 | 1:28 PM | Uptown Chicago – 1101 W. Lawrence Avenue, Chicago, IL | Teller | $9,000 |
| 5/4/2022 | 2:03 PM | Howard & Clark - 1791 W. Howard Street, Chicago, IL | ATM | $2,900 |

48.     On or about May 4, 2022, law enforcement officials met with CS-1 and affixed a concealed audio and video recording device to CS-1. Law enforcement officials then setup surveillance in the area of a Popeye's restaurant located on the 7000 block of South Western Avenue in Chicago, Illinois.

49.     At approximately 3:18 p.m., law enforcement officials conducting surveillance observed ADEKUNLE arrive in a white Toyota sedan ("ADEKUNLE Vehicle 2")[12] and park on W. 73rd Street adjacent to Popeye's restaurant. CS-1 then exited his vehicle and entered ADEKUNLE Vehicle 2.

50.     Based on a review of the audio and video recording, photographs of the transaction captured by law enforcement officials, and information provided by CS-1, during the meeting:

a.     CS-1 began counting cash contained in two white envelopes given to him by ADEKUNLE after entering ADEKUNLE Vehicle 2.

---

[12] According to records from the Wisconsin Secretary of State database, ADEKUNLE Vehicle 2 is registered to Individual B at an address in Madison, Wisconsin.

b. CS-1 said that he would give the cash received from ADEKUNLE to his associate, who would deposit another $40,000 into Subject Account 2 the following week after returning from a trip. ADEKUNLE said that CS-1's associate should increase the amount of the next deposit.

51. At approximately 3:22 p.m., law enforcement officials observed CS-1 exit ADEKUNLE Vehicle 2 and reenter his vehicle. CS-1 then immediately met with law enforcement officials at a predetermined nearby location. Review of the video recording confirmed CS-1 drove directly to and from the location he met with law enforcement officials and Popeye's restaurant before and after the transaction.

52. At this location, CS-1 provided law enforcement officials with two white envelopes containing large quantities of cash. After CS-1 departed, law enforcement officials sealed, transported, and secured the envelopes in storage. The envelopes were later photographed and determined to contain $22,000 in cash by a bank employee.

*On May 23, 2022, ADEKUNLE Received Approximately $30,000 in Funds Represented to be Proceeds of PPP Fraud and Later Transferred Approximately $24,000 in Cash to CS-1*

53. Based on ADEKUNLE's laundering of the $50,000 provided by law enforcement and represented to be PPP fraud proceeds, law enforcement officials directed CS-1 to make contact with ADEKUNLE and advise ADEKUNLE that he had fraud proceeds that he needed to launder and to ask for ADEKUNLE's assistance in laundering those proceeds.

23

54.     Between on or about May 10, 2022 and May 22, 2022, ADEKUNLE, using ADEKUNLE Account 1, and CS-1 exchanged numerous calls, voice notes, and messages on WhatsApp regarding another money transfer. During the exchanges:

a.      On or about May 10, 2022, between approximately 12:44 p.m. and 4:20 p.m., ADEKUNLE placed unanswered video and voice calls to CS-1, and sent messages which stated, "I called you," "How far about the guy [CS-1's associate]?" "Is everything OK with you?" "Have been calling since morning not answering and replying." At approximately 4:31 p.m., CS-1 responded, "Been busy," and "Will call u when am going home." At approximately 4:34 p.m., ADEKUNLE stated, "OK sir."

b.      On or about May 12, 2022, at approximately 11:35 a.m., CS-1 stated, "He [CS-1's associate] will send 50k [$50,000] on Tuesday." At approximately 12:06 p.m., ADEKUNLE replied, "OK sir."

c.      On or about May 17, 2022, at approximately 11:21 a.m., CS-1 stated, "He [CS-1's associate] go send am [additional money to Subject Account 2] this afternoon. Check [Subject Account 2] later or check in morning if u see the funds." At approximately 11:27 a.m., ADEKUNLE responded, "OK sir."

d.      On or about May 18, 2022, at approximately 4:22 p.m., ADEKUNLE stated, "Hello sir." A few minutes later, CS-1 responded, "Waiting on his [CS-1's associate's] response." At approximately 4:33 p.m., ADEKUNLE sent a voice note in Yoruba during which she stated that it [availability of funds] depends on when they [bank personnel] process it [transfer to Subject Account 2].

e. Later that evening, after receiving no response from CS-1, at approximately 8:43 p.m., ADEKUNLE sent messages which stated, "How far [when will money be transferred] sir?" and "What did he [CS-1's associate] say?"

f. On or about May 19, 2022, at approximately 8:25 a.m., CS-1 replied, "He [CS-1's associate] said he did it [transferred money to Subject Account 2] takes 3 days [for funds to clear]." At approximately 8:57 a.m., ADEKUNLE replied, "OK sir."

g. On or about May 20, 2022, at approximately 12:25 p.m., ADEKUNLE sent an image of the Chase Bank mobile application showing the available balance in Subject Account 2 as $77.76. CS-1 immediately replied, "Ok will call him [CS-1's associate] now." ADEKUNLE then stated, "OK sir."

h. Approximately thirty minutes later, CS-1 stated, "He [CS-1's associate] is waiting on it to leave his account today he has scheduled it." ADEKUNLE responded, "Oh OK," and "Maybe by night."

i. On or about May 21, 2022, between approximately 1:23 p.m. and 1:56 p.m., CS-1 and ADEKUNLE continued their discussion about the transfer. During the recorded conversation, at approximately 1:23 p.m., ADEKUNLE stated, "Hello sir." CS-1 replied, "How far[?]" ADEKUNLE then stated, "I want to ask ni [U/I] sir." CS-1 responded, "I think it [money] left his account." ADEKUNLE then stated, "Let me check [Subject Account 2 balance]" and "It [transfer] have not enter [posted]." CS-1 replied, "Ok I think u get it [funds transfer] Monday or Tuesday." ADEKUNLE then asked, "Is it left his account?" At approximately 1:55 p.m., CS-1 responded, "He

25

[CS-1's associate] said it was leaving his account yesterday will call him to find out. I have people here now." ADEKUNLE then stated, "OK sir."

        j.      On or about May 22, 2022, between approximately 12:01 p.m. and 1:15 p.m., ADEKUNLE sent messages, which stated, "Good afternoon, sir," and included a stock image of a disappointed child. CS-1 did not respond.

        55.    Based on my training and experience and knowledge of the investigation, I believe that in the above exchanges: (a) ADEKUNLE repeatedly asked about the status of incoming wire transfers; and (b) ADEKUNLE sent images of the Chase Bank mobile application showing the available balance of Subject Account 2 to prove the transfer had not been completed.

        56.    On or about May 23, 2022, law enforcement officials sent a $30,000 wire transfer from a covert FBI account to Subject Account 2 for beneficiary "Linda Williams," at the 71st Place Address, as designated by ADEKUNLE.

        57.    On or about May 23, 2022, between 12:05 p.m. and 6:34 p.m., ADEKUNLE, using ADEKUNLE Account 1, and CS-1 exchanged calls and messages on WhatsApp about the wire transfer. During the exchanges:

        a.      At approximately 12:05 p.m., ADEKUNLE placed an unanswered call to CS-1. In reply, CS-1 sent the following messages: "Can I call you later?" "At airport," "Picking up my parents," and "How far[?]" ADEKUNLE then stated, "Ok sir," and "You told me you will call him [CS-1's associate] and get back to me." A few hours later, at approximately 2:07 p.m., ADEKUNLE sent an image of the Chase Bank mobile application showing the available balance of Subject Account 2 as

$71.09. CS-1 responded, "U should see it [transfer to Subject Account 2] today," and "He sent it [wire transfer]." ADEKUNLE then stated, "OK sir."

b.      At approximately 5:26 p.m., CS-1 stated, "Check it [Subject Account 2]." ADEKUNLE replied, "I will check it when I get home." At approximately 6:28 p.m., ADEKUNLE sent an image of the Chase Bank mobile application showing the available balance in Subject Account 2 as $30,071.09 and a stock image of a disappointed child.

c.      CS-1 immediately responded, "He [CS-1's associate] did [transferred] 30k [$30,000.]." ADEKUNLE replied, "Yes just 30k [$30,000]" and resent the same image of the child.

58.    Based on my training and experience and knowledge of the investigation, I believe that in the above exchange ADEKUNLE confirmed that CS-1's associate had sent a wire transfer of $30,000 into Subject Account 2 and expressed disappointment that it was only for $30,000 and not a larger amount of money.

59.    On or about May 25, 2022, CS-1 informed law enforcement officials that he received a call from ADEKUNLE.  The call was not recorded and law enforcement officials were unable to confirm this call through historical call records.  According to CS-1, during the call, ADEKUNLE told CS-1 that only $6,000 [20 percent fee] remained in Subject Account 2 [after completing cash withdrawals] and that she was available to meet the following day.

60.    On or about May 25, 2022, between approximately 3:27 p.m. and 3:53 p.m., and May 26, 2022, between approximately 11:04 a.m. and 12:02 p.m.,

27

ADEKUNLE, using ADEKUNLE Account 1, and CS-1 exchanged messages over WhatsApp to coordinate a meeting to exchange cash withdrawn from Subject Account 2. During the exchange:

      a.    At approximately 3:27 p.m., CS-1 stated, "Let's meet at 1.30 [p.m.] tomorrow please I have to go to suburb by 1.45 [p.m.] or so." ADEKUNLE replied, "Let do it by 12pm." CS-1 then stated, "Ok 12 [p.m.] is fine," and ADEKUNLE confirmed, "OK sir."

      b.    On the following morning, at approximately 11:04 a.m., CS-1 stated, "Don't forget 12 [p.m.] o [unintelligible]." At approximately 11:30 a.m., ADEKUNLE replied, "On my way," and CS-1 stated, "Ok let's meet by the Popeyes [restaurant]."

      c.    At approximately 11:56 a.m., CS-1 asked, "How far are you[?]" and ADEKUNLE responded, "3mint [minutes]." At approximately 12:01 p.m., ADEKUNLE stated, "Am here," and CS-1 replied, "Ok coming now."

61.    Subpoenaed records and surveillance footage from Chase Bank show that prior to and after meeting CS-1, ADEKUNLE withdrew cash from Subject Account 2 through a number of transactions, as set forth below. Based on my training and experience, the transactions were structured such that they involved less than $10,000 and occurred at multiple bank branches, in an attempt to circumvent BSA reporting requirements and avoid bank suspicion about ADEKUNLE's withdrawals.

| Date | Time | Branch | Type | Amount |
|---|---|---|---|---|
| 5/24/2022 | 1:40 PM | Hyde Park - 1204 E. 53rd Street, Chicago, IL | Teller | $9,000 |
| 5/24/2022 | 2:09 PM | Bronzeville - 3500 S. King Drive, Chicago, IL | ATM | $3,000 |
| 5/25/2022 | 1:39 PM | Bronzeville - 3500 S. King Drive, Chicago, IL | Teller | $9,000 |
| 5/25/2022 | 2:04 PM | Hyde Park - 1204 E. 53rd Street, Chicago, IL | ATM | $3,000 |
| 5/26/2022 | 11:30 AM | Stony Island - 6650 S. Stony Island Avenue, Chicago, IL | ATM | $3,000 |
| 5/27/2022 | 12:39 PM | Bronzveille - 3500 S. King Drive, Chicago, IL | ATM | $3,000 |

62.     On or about May 26, 2022, law enforcement officials met with CS-1 and affixed a concealed audio recording device to CS-1.  Law enforcement officials then setup surveillance in the area of a Popeye's restaurant located on the 7000 block of South Western Avenue in Chicago, Illinois.

63.     At approximately 12:07 p.m., law enforcement officials conducting surveillance in the area observed ADEKUNLE arrive in ADEKUNLE Vehicle 2 and park on W. 73rd Street adjacent to Popeye's restaurant.  CS-1 then exited his vehicle and entered the front passenger seat of ADEKUNLE Vehicle 2.

64.     Based on a review of the audio recording and information provided by CS-1, during the meeting:

a.     While inside the car, CS-1 counted cash received from ADEKUNLE and determined that she initially gave him $22,680 rather than $24,000 as agreed. After collecting the correct amount of cash, CS-1 said he would contact ADEKUNLE the following week regarding conducting another transaction.

65.    At approximately 12:21 p.m., law enforcement officials observed CS-1 exit ADEKUNLE Vehicle 2 and reenter his vehicle. CS-1 then immediately met with law enforcement officials at a predetermined nearby location.

66.    At this location, CS-1 provided law enforcement officials with one white envelope containing a large quantity of cash.  After CS-1 departed, law enforcement officials photographed and sealed the cash in two envelopes. Law enforcement officials then transported and secured the envelopes in storage. The envelopes were later determined to contain approximately $24,000 in cash by a bank employee who deposited the cash into a bank account.

### ADEKUNLE Changes Phone Number, WhatsApp Account, and Bank Account

67.    According to CS-1, in July 2022, ADEKUNLE informed CS-1 that she changed her phone number to (XXX) XXX-1539 ("ADEKUNLE Phone 3").[13] At or around the same time, ADEKUNLE began communicating with CS-1, using a WhatsApp account with the username "Jelilat" ("ADEKUNLE Account 2"). The ADEKUNLE Account 2 profile included a photo of ADEKUNLE and listed ADEKUNLE Phone 3 in the account information. According to records from WhatsApp, ADEKUNLE Account 2 had a push name of "Jelilat" and account identifier of ADEKUNLE Phone 3.

68.    On or about July 7, 2022, between approximately 1:44 p.m. and 1:45 p.m., ADEKUNLE, using ADEKUNLE Account 2, and CS-1 exchanged messages on

---

[13] According to subpoenaed records, ADEKUNLE Phone 3 is a prepaid device with no associated subscriber name or address.

WhatsApp. During the exchange, ADEKUNLE stated, "Hello sir," "It me Jelilat," and "This is my new number [ADEKUNLE Account 2 and ADEKUNLE Phone 3]." CS-1 replied, "Ok."

69.     On or about August 10, 2022, between approximately 4:51 p.m. and 6:02 p.m., ADEKUNLE, using ADEKUNLE Account 2, and CS-1 exchanged additional messages on WhatsApp. During the conversation, ADEKUNLE stated, "Hello sir," and CS-1 replied, "What's up." ADEKUNLE then stated, "Am good and you," and CS-1 wrote, "Am good." ADEKUNLE then asked, "How far about the guy [CS-1's associate] is it [he] back [to launder additional money?]" CS-1 did not respond.

70.     On or about August 22, 2022, at approximately 12:08 p.m., ADEKUNLE, using ADEKUNLE Account 2, and CS-1 exchanged additional messages on WhatsApp. During the exchange, ADEKUNLE stated, "BANK NAME:CITIBANK BUSINESS NAME:D3 PROCESS LLC ACCOUNT NUMBER: XXXXX2939 ROUTE NUMBER:XXXXX0801 ("Subject Account 3") BANK: 136A N. YORK ST ELMHURST IL 60126." CS-1 replied, "Ok." ADEKUNLE then wrote, "Yes sir."

71.     According to records provided by Citibank, Subject Account 3 is in the name of "D3 Process, LLC" and was opened with a $100 deposit on May 26, 2022, by a sole signatory, "Linda Williams," under the business title of "President," using the 168th Street Address, and ADEKUNLE Phone 2.  Citibank records reflect that the account owner (ADEKUNLE) used a Kenyan passport, depicting an image of ADEKUNLE but in the name of "Linda Williams" and a ComEd utility bill for identification.

31

72.     The utility bill contained inconsistent information and typographical errors with two similar, but different street addresses including the 168th Street Address and another address "XXXX 167th Street, Country club hills, IL 60478-2011," (hereinafter (the "167th Street Address") with a partially uncapitalized city name.  In response to a subpoena issued in October 2022, ComEd indicated that they have no records for the account number, "Linda Williams," or the 167th Street Address listed on the utility bill. Based on internet and public database searches the 167th Street Address does not exist.

73.     Furthermore, Citibank records show Internal Revenue Service and Illinois Secretary of State incorporation records listing the same fraudulent information were used to open Subject Account 3.  As noted, the same passport, utility bill, identifying information, address, and/or phone number were used to open Subject Accounts 1 and 2.

74.     Based on my training and experience and the errors contained in the utility ball, I believe that the utility bill is fraudulent and that ADEKUNLE used the fraudulent utility bill to open Subject Account 3 in order to receive and transmit fraud proceeds.

**ADEKUNLE Uses Subject Account 3 to Receive and Launder $600,000 in Proceeds from a Business Email Compromise Scheme**

75.     According to law enforcement officials, on or about September 19, 2022, a victim ("Victim 1") from Overland Park, Kansas contacted the FBI to report a fraud. According to Victim 1 and records provided by Victim 1 to law enforcement:

a.     Victim1 had been communicating with an individual ("Individual C") at Capital Federal Savings Bank in Kansas City, Kansas, regarding a wire transfer for the down payment on a mortgage funding the construction of a home.

b.     On or about September 14, 2022, at approximately 3:13 p.m., Victim 1 received an email with the subject line, "[Victim 1]: Closing Package," that appeared to be from Individual C (the "Fraudulent Email"). The Fraudulent Email included the Capital Federal Savings Bank logo and Individual C's name and email address in the sender field and contact information in the signature block. The Fraudulent Email stated: "Wire instructions Hi (Victim 1), Please find attached wire transfer details for our sub bank account which we use in receiving incoming large transactions. Please kindly email me the wire confirmation copy so we can follow up your transfer for fast credit. Thank you."

c.     A scanned document attached to the Fraudulent Email titled "Wire Instructions," was dated September 15, 2022, and included the Capital Federal Savings Bank logo. The document stated, "OUR SUB WIRE TRANSFER DETAILS BANK NAME: CITI BANK BENEFICIARY NAME: D3 PROCESS LLC ACCOUNT NUMBER: XXXXX2939 [Subject Account 3] ROUTINE NUMBER: XXXXX0801 BANK ADDRESS: 136A N. YORK ST ELMHURST IL 60126, If you have any questions or need assistance, please contact me. Thank you, (Individual D), NMlS# XXXXXX XXX-XXX-2256 XXXXX@capfed.cam."

d.     On or about September 14, 2022, at approximately 8:15 p.m., Victim 1 forwarded the Fraudulent Email and attachment to his financial advisor

("Individual E") with directions for him to transfer $600,000 from his brokerage account at TD Ameritrade to Subject Account 3 and provide confirmation of the transaction, as specified in the wire instructions, prior to his mortgage closing.

      e.    On or about September 15, 2022, Individual E executed the wire transfer as requested by Victim 1.

      f.    At or prior to the mortgage closing, Victim 1 was informed by employees of Capital Federal Savings Bank that they did not receive his down payment and that the wire transfer was likely sent to a fraudulent bank account. As discussed below, the wire transfer was sent to ADEKUNLE's bank account—Subject Account 3.

76.    Review of the header, or routing information and metadata, for the Fraudulent Email containing the wire instructions document, indicates that it was sent from a server in the United Arab Emirates and the "From" field was spoofed to display Individual C's name and Capital Federal Savings Bank email account. More specifically, the "From" field was altered to show Individual C's name and the email address XXXXXXX@capfed.com, but the "Reply-To" and originating email address was actually dr.rita.nawar@weightcareclinic.me.

77.    Based on my training and experience and knowledge of the investigation, I believe that an unidentified perpetrator or perpetrators of the fraud gained knowledge of the mortgage closing and pending wire transfer by compromising Victim 1's email account. The unidentified perpetrator or perpetrators then sent or

caused to be sent the Fraudulent Email described above to Victim 1 so that Victim 1 would send the funds to Subject Account 3 controlled by ADEKUNLE.

78.     According to records from Citibank:

a.     On or about September 15, 2022, Subject Account 3 received a wire transfer of $600,000 from a TD Ameritrade brokerage account in Victim 1's name.

b.     Before the $600,000 wire transfer, the balance of Subject Account 3 was $82.07.

c.     $531,111.01 of the $600,000 in funds received by wire transfer on September 15, 2022 were disbursed from Subject Account 3 between September 15, 2022 and September 20, 2022.   Citibank froze Subject Account 3 on or about September 21, 2022.

d.     These transactions included debit card, ATM, and other withdrawals totaling $49,111.01 in structured amounts below BSA reporting thresholds, purchases of cashier's checks made payable to company names totaling $285,000, and a wire transfer in the amount of $197,000 sent to a bank/company located in Nigeria. Through review of subpoenaed surveillance images received from Citibank, agents confirmed that ADEKUNLE conducted the cashier's check purchases on or about September 16 and 17, 2022 and other transactions inside branch locations.

e. As of March 9, 2023, law enforcement and the affected financial institutions had recovered approximately $265,971.06 of the funds transferred to Subject Account 3 resulting in a net loss to Victim 1 of approximately $334,028.94.

79. On or about October 14, 2022, between approximately 11:20 a.m. and 11:33 a.m., ADEKUNLE, using ADEKUNLE Account 2, and CS-1 exchanged messages on WhatsApp regarding the status of her fraudulent bank accounts and conducting another money transfer with CS-1's associate. During the exchange:

a. CS-1 asked, "How far[?]" and "Is the account still active[?]" CS-1 then stated, "The guy [CS-1's associate] wan do [transfer] 30k [$30,000] on Monday. It's the same ppp [Paycheck Protection Program] ise [fraud scheme]." ADEKUNLE replied, "Good morning sir," "No sir," and "But I have us back [a US Bank] personal [account open and available to launder funds]."

b. In response, CS-1 asked, "Y now what happened[?]' and then stated, "Send me the one [bank account] you have."

c. A few minutes later, ADEKUNLE, using ADEKUNLE Account 2, placed an unanswered call to CS-1. In reply, CS-1 sent additional WhatsApp messages, which stated, "With a customer," and "Will call back in a few."

80. On the same date, at approximately 11:37 a.m., CS-1 called ADEKUNLE, using ADEKUNLE Account 2, and spoke to ADEKUNLE on WhatsApp regarding the proposed money transfer and the status of Subject Account 3. The call was recorded. During the call:

a.　ADEKUNLE said that her Citibank business account [Subject Account 3] was closed because of money [fraud proceeds] deposited into it. CS-1 then asked about the amount of the deposit. ADEKUNLE replied that it was a "lot," but not too much and that banks can sometimes be irrational.

b.　CS-1 then asked if ADEKUNLE was able to retrieve the funds in the account. ADEKUNLE responded that she withdrew part of the money, but not everything.

c.　ADEKUNLE then said she has a personal account at US Bank. CS-1 replied that ADEKUNLE should send the account information to him because his associate has another $30,000 from a "PPP [fraud scheme]" he wants to transfer.

d.　CS-1 then commented that ADEKUNLE must have many patrons who are transferring money to her accounts. ADEKUNLE replied that there are not many.

e.　ADEKUNLE said that she also opened a business account with Chase Bank on Friday of the prior week but had not received the bank card yet. CS-1 then directed ADEKUNLE to send him the information for both bank accounts when she got home because his associate already had the money.

81.　Between on or about October 14, 2022, at approximately 4:12 p.m., and October 18, 2022, at approximately 11:14 a.m., ADEKUNLE, using ADEKUNLE Account 2, and CS-1 exchanged additional messages on WhatsApp regarding her bank accounts. During the exchange:

a.     On or about October 14, 2022, at approximately 4:12 p.m., ADEKUNLE stated, "BANK NAME US BANK NAME: CHERYL KRAUS ACCOUNT NUMBER: XXXXXXXX6294 ROUTINE NUMBER:XXXXX4779" ("Subject Account 4"). CS-1 then replied, "Send the business [bank account] too."

b.     ADEKUNLE then wrote "I don't have the [ATM] card yet." CS-1 replied, "Ok," and "He [CS-1's associate] says he wants to use the business account."

c.     On or about October 15, 2022, at approximately 11:12 a.m., ADEKUNLE sent a voice note during which she repeated that she did not have a problem providing the Chase business account information to CS-1 but did not have the card yet as it was opened on Friday of the prior week therefore money [received from CS-1's associate] would be waiting in the account. ADEKUNLE then confirmed that she had the card for the US Bank account [Subject Account 4] which had been open for a while.

d.     Later that afternoon, at approximately 4:06 p.m., CS-1 replied, "He [CS-1's associate] says he will wait for you to get the card and he wants to use the business account."

e.     On or about October 18, 2022, at approximately 11:14 a.m., ADEKUNLE responded, "BANK: CHASE BUSINESS NAME: GASTELUZ LINE INC ACCOUNT NUMBER:XXXXX3581 ROUTINE NUMBER: XXXXX0013 BANK ADDRESS: 17157 S HARLEM AVE TINLEY PARK IL 60477" ("Subject Account 5").

82.     Based on my training and experience and knowledge of the investigation, I believe that: (a) ADEKUNLE used Subject Account 3 to receive and

launder fraud proceeds sent by Victim 1 at the direction of unidentified subjects and/or co-conspirators as part of a business email compromise scheme; (b) after discovery of the fraud involving Subject Account 3, Citibank shut down Subject Account 3; and (c) ADEKUNLE communicated with CS-1 about obtaining additional proceeds represented to be derived from fraud into Subject Account 4 or 5 and ADEKUNLE agreed to accept the funds.

## **CONCLUSION**

83.    Based on the above information, there is probable cause to believe that:

a.    On or about May 26, 2022, at Chicago, in the Northern District of Illinois, Eastern Division, ADEKUNLE did knowingly participate in a financial transaction for the purpose of concealing the nature, source, ownership, location, and origin of funds represented to be derived from specified unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(3); and

b.    On or about September 19, 2022, at Chicago, in the Northern District of Illinois, Eastern Division, ADEKUNLE did knowingly conduct and attempt to conduct a financial transaction affecting interstate and foreign commerce, namely, a wire transfer in the amount of $197,000 sent to a bank/company located in Nigeria, which involved the proceeds of a specified unlawful activity, namely, wire fraud, in violation of Title 18, United States Code, Section 1343, knowing that the transaction was designed in whole and in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of said specified unlawful activity, and that while conducting and attempting to conduct such financial

transaction, knew that the property involved in the financial transaction represented the proceeds of some form of unlawful activity.

FURTHER AFFIANT SAYETH NOT.

MARK Z. JOHN
Special Agent, Federal Bureau of
Investigation

SWORN TO AND AFFIRMED by telephone March 16, 2023.

Honorable JEFFREY T. GILBERT
United States Magistrate Judge